**ROBICHEAUX et al. v. SUN OIL CO. et al.**
(No. 1639.)

Court of Civil Appeals of Texas. Beaumont.
Oct. 12, 1928.

Rehearing Denied Oct. 24, 1928.

A. D. Lipscomb and Howth, Adams & Hart, all of Beaumont, for appellants.

F. J. & C. T. Duff, C. A. Toler, and R. E. Masterson, all of Beaumont, T. L. Foster, of Dallas, John E. Green, Jr., of Houston, and Llewellyn & Kayser, of Liberty, for appellees.

WALKER, J. In 1924 and 1925, and many years prior thereto, appellant J. E. Broussard was the owner of 1,500 acres of land fronting on Hillebrandt bayou in Jefferson county, Tex. In 1924, Broussard's tenant, M. Robicheaux, cultivated in rice 400 acres, and in 1925, 700 acres of this land, irrigating his crops from the waters of the bayou, as had been done in previous years. In their natural state the waters of the bayou were suit-

able for irrigation purposes, but in 1924 and 1925 they were polluted by drainage from Spindle Top hill, one of the most productive oil fields in the world. By reason of this pollution, the waters of the bayou were rendered unfit for irrigation purposes, and, as irrigation is essential to rice cultivation, Robicheaux lost his crops for the two years named.

This suit was instituted by M. Robicheaux and his landlord, J. E. Broussard, as plaintiffs, against the following named producers of oil on Spindle Top hill: The Sun Oil Company, Gulf Production Company, Unity Oil Company, Wonder Oil Company, Selma Oil Company, Stella Oil Company, Baker Oil Company, Eddy Oil Company, Light Oil Company, Walter T. Wherry, John Wynn, R. Mulholland, W. S. Oldham, J. D. Adams, C. A. Burton, W. J. Philp, J. P. Philp, John Philp, Philp Bros., Wherry & Rambo, Wherry & Laughman, D. M. Caffall, J. H. Halliday, Ellis & Co., Myles Jones, J. C. Wilson, Geo. L. Adsit, and Wilson-Broach Company, for damages for the loss of crops, praying for $16,800 as damages for the crop of 1924, and $25,725 for the crop of 1925. Upon a trial to a jury, judgment was entered against the plaintiffs on an instructed verdict, from which they have duly perfected their appeal. Appellants Broussard and Robicheaux will be referred to as plaintiffs, and the appellees as defendants; that being their respective relations in the lower court.

Plaintiffs alleged that all of the defendants were joint tort-feasors, and prayed for a joint and several judgment against them. The defendants answered by pleas in abatement of misjoinder of parties and causes of action, denying joint action in the pollution of the bayou, special and general demurrer, general denial, etc. All exceptions were overruled. On conclusion of the evidence, the court being of the opinion that joint action was not shown by the defendants in the pollution of the bayou, the jury were instructed to return a verdict in favor of defendants. However, before this instruction was given, plaintiffs asked permission to dismiss as to such of the defendants who in the judgment of the trial court were not shown to have participated in the pollution of the bayou, but this motion was overruled. Due exceptions were reserved to this ruling. Since no issue of pleading is before us, but simply the sufficiency of the evidence to sustain the instructed verdict on the court's conclusion of misjoinder of parties and causes of action, a further statement from the pleadings is not necessary.

The facts are as follows:

In 1924 and 1925 the defendants were oil operators, producing oil from wells located on Spindle Top hill near the city of Beaumont from a producing area on the hill of about 85 acres. The production of salt water is an inevitable incident to the production of oil. The disposition of this salt water is one of the serious and vexing problems of the oil industry. If uncontrolled, it pollutes the fresh water streams into which it drains. All the drainage from Spindle Top hill and the territory immediately surrounding it is by gravity west towards and into Hillebrandt bayou at a point above plaintiffs' land. The drainage from this territory is through a large ditch constructed by the drainage district, which passes to the west and northwest of Spindle Top hill. Other smaller ditches encircle and cross the hill, discharging into the main ditch. Certain of the public roads also drain into this main ditch, which finally carries all the drainage from Spindle Top hill into the bayou.

From the discovery of oil on Spindle Top hill prior to 1900, up to and inclusive of the years 1924 and 1925, all the drainage has been into this bayou, but since 1925 the drainage has been changed by an artificial ditch draining in the opposite direction into the Neches river. Without detailing the evidence, it is sufficient to say that plaintiffs raised for the jury the issues that (a) the drainage from Spindle Top hill in 1924 and 1925 was into Hillebrandt bayou; (b) this drainage polluted the waters of the bayou, rendering them unfit for irrigation purposes; (c) this pollution caused the loss of plaintiffs' crops; (d) the pollution was a wrongful act by the respective operators, and constituted an actionable tort against them individually in plaintiffs' favor; (e) a measure of damages in plaintiffs' favor against each of them sufficient to have supported a jury finding estimating plaintiffs' loss; (f) plaintiffs' land was riparian to the bayou; and (g) the pollution of the bayou was the proximate result of the operations of the defendants on Spindle Top hill.

In view of the foregoing conclusions, it is necessary for us to inquire into the evidence only on the issue of concert of action among the defendants in the pollution of the bayou in 1924 and 1925. During these years the defendants were operating upon separate leases in various parts of the producing area of Spindle Top hill, all producing salt water and oil. During these years the larger companies, such as the Gulf Company and the Sun Company, not only cared for their own production, but also bought the production of the smaller operators. For the purpose of taking care of the salt water produced by it and its associates, that is, the smaller operators who sold to it their production, the Gulf Company maintained a storage tank on the northwest side of the hill; for like purpose the Unity Company, the Stella Company, and the Wilson-Broach each maintained a tank on the east side of the hill. Another tank was maintained on that side, but its ownership was not clearly shown. Other tanks may have been maintained on this field, but, in view of the

disposition we are making of the case, those named are sufficient to show the relation of the salt water tanks to the sole question at issue. None of the smaller producers attempted to maintain separate tanks, but, as already stated, ran their salt water into the tank of the company to whom they sold their production. Most of the smaller producers stored their water with the Gulf Company, as this company was at that time taking their production. The names of these smaller producers were reflected by the evidence. The storage tanks were under the direct control of their respective owners. There was no concert of action or agreement among the operators about building these tanks, but, it being necessary to impound the salt water, each company, independent of and without consulting the other operators, took such steps as it thought necessary to discharge this duty. As explaining the relation of the operators to each other, the following quotation is taken from the testimony of the witness J. D. Adams:

"I have lived in Jefferson County 33 or 34 years. I am a small oil producer on Spindle Top, beginning in 1923. Since then I have been and am still a producer. Other producers there in 1924 and 1925 were Gulf Production Company, Sun Oil Company, Wilson-Broach, Unity Oil Company, Stella Oil Company, W. T. Wherry, and his associates, Philp Bros., Irish and Mulholland. The Gulf Production Company operated all over the field practically. The Stella Oil Company, Unity Oil Company and Wilson-Broach operate in the Keith-Ward tract in the Southeastern part of the field. The Sun Company is practically in the middle of the field, Philp Bros. adjoining them a little out to the West and I am just a little bit to the South of Philp Bros., and the Wonder Oil Company and Baker Oil Company have some production right in that part of the field. The Baker has a little scattered pretty well in the East, West and Southwest. Oldham has some production in the North part of the field, Wherry in the North and Northwest. In 1924 and 1925 the oil producing acreage covered an area of 80 or 85 acres. The oil producers all produced some salt water, all of us. Another producer there is the Eddy Oil Company. Philp Bros. is a partnership, composed of John Philp, Will Philp and another.

"From the way that salt water tastes, there might have been most anything in it. Some of it you could drink, I guess, and probably there is some of it such that a mouth full would kill you. I don't know just what's in it. It is highly mineralized. It is not marketable. It is a waste product. We have to get rid of it some way. It is continually going out day and night. I am sure there is not a time that everybody is shut down. There are times that most of us are shut down. They were operating in 1924 and 1925. Spindle Top is a hill about ten or twelve feet high. It drains towards Hillebrandt Bayou. In fact all this water from the river bank drains towards Hillebrandt Bayou. The salt water produced on each side of Spindle Top drains into Hillebrandt Bayou.

"As to what arrangements exist between the producers of salt water I don't know just what the other fellow had or did. I did not attend to his business. My arrangement was to go into the Gulf Production Company's pit. We run it into a ditch and from the ditch it goes to the Gulf Production Company's reservoir. The ditch was dug on top of the hill. Its course is from a salt water pit they have on the North of the field almost due South for a hundred or 200 yards and it sweeps around the high part of the hill close up to the Keith-Ward tract, and I put some ditches to that and built up to the Keith-Ward so that I would have to use less pipe to convey my water. The Gulf Production Company had something to do with building some of that ditch—not all of it. They built part and I built part. It all contributed to the same ditch. Several contributed toward digging that ditch. They were Philp Bros., Halliday, (that is Stella Oil Company) and myself and probably some others. We had to have a place for our salt water to go and be stored, and we had no other place for it to go. The ditch was about five or six blocks long and ramified around on top of the hill and on down Northwest to the Gulf Production Company's pit. Some of the wells were on the ditch and some five or six blocks from it, a thousand feet anyway. Those wells along the ditch had a little flow pipe that ran from the separating tank to the ditch. Those further away also used flow pipes. Sometimes the flow pipes leaked at night. I am speaking of my own. I suppose the others had the same trouble. The oil and salt water were produced together and put in tanks, then we would drain the salt water off in pipes to the ditch. We had what we call a settling tank and storage tank. The settling tank was the separating tank. The water would go out on one side and a little drainage of oil would go in a storage tank on the other side. One was connected to a pipe line where they pump the oil and the other would go to the flow pipe that ran to a ditch where the salt water ran through the reservoir. Then the ditch would lead to the pit or into a flume that was a continuation of the pit. When the salt got in the ditch you could not tell whose it was. You could not tell how much each one put in. All the salt water got mixed together in a ditch and went into the pit. That was true in 1924 and 1925. Now I won't say all because some of those fellows probably might not have put the water into the Gulf pit. In fact there are some that probably did not. I think Wilson-Broach had a separate pit. I don't know whether any one else but them put water in there or not. I never paid any attention to that pit. The Stella Oil Company and the Unity Oil Company had a few wells close to the Gulf pit, and it was more convenient to put it in the Gulf ditch than to convey it to their own reservoir. I think they had a reservoir of their own. They also put salt water in the ditch that I spoke of, except the Unity. I could not say the Unity put a drop in it.

"The Gulf Production Company took care of most of the salt water that was produced out there. The reservoir on the East side of the hill probably covered 15 or 20 acres, maybe more. I think that belongs to the Unity, either the Unity or Stella, or some of those folks, or maybe both of them own it together. They sometimes have a partition between them and you can't tell whether they are separate pits

or just built on to each. I don't know where Wonder Oil Company put its salt water but some of it was produced right by me that went to the Gulf Production Company's pit. I think the Baker Oil Company had a pit of its own and most of their water went in that pit and they probably had a little, I think, that went to the Gulf Production Company's pit. I could not say where the Sun Company put its water. They had some wells not very far from the ditch, probably a block and a half away. Wherry and Langham probably put all of theirs in the Gulf Production Company's pit. Philp Bros. put some there. I don't know whether they put all of theirs in there or not. I don't know that any of the levees ever broke or overflowed. The water from Spindle Top would evidently go to the Gulf down Hillebrandt Bayou. That is the natural drainage."

■ To detail the facts explaining how the salt water escaped from these storage tanks and from the field into the ditches would needlessly extend the statement. It is sufficient to say that the evidence raised the issue of negligence against each operator on the field, in his personal relation to the field, and, without relation to the issue of concert of action, in permitting the salt water to escape from his particular lease and enter the drainage into Hillebrandt bayou. As already stated, we are trying to confine the statement to the issue of concert of action. Admittedly, among the users of the separate tanks there was concert of action. On the issue of concert of action as among all the operators, we quote as follows from appellants' summary of the evidence:

Mr. Philp testified:

"This witness is an oil producer at Spindle Top. Some of his wells produce salt water. They have a five acre reservoir but their salt water goes into the Gulf Production Company's tank, partly through pipes and partly through a ditch. He originally built the ditch that leads into Gulf Production Company's tank. Before 1924 they had piped the water but in order to save buying pipe every year they cut the ditch and kept it up with the other men that wanted to go in there with them. They had permission from Mr. Moore, one of the managers of Gulf Production Company. Among others who helped keep it up were Mr. Halliday. Witness states that when the ditch needed shoveling out, they would call out all the other boys to help, all the other producers of salt water who put their water in the Gulf tank. He says Mr. Moore (of the Gulf Company) said: 'Come on, boys, it is our business to take care of this salt water.' Witness states: 'Whenever anything was needed we would go over our ditch and Gulf Company's ditch at the same time. During 1924 and 1925 the Gulf people kept up the ditch other than we would go over it and see that it was not blocked.' He further states: 'In 1924 or possibly 1925 we met with Marion Brock, George Adsit and Joe Myers, Judge Campbell and Cook Wilson.' He states that Joe Myers was one of the first men that took care of witness' salt water in 1913 in a reservoir; that Mr. Myers is secretary or president of the Unity Oil Company. Marion

Brock was with Gulf Production Company. They were producing salt water and oil in 1924 and 1925. At the meeting they discussed the action of the Legislature as doing away with their six months' injunction and they were up against it. At that meeting there were various ideas advanced. It was possibly called by Mr. Patrick, of the Gulf Production Company. The idea was not to let the salt water get away. He could not say if the meeting was in the Sun Company's office or that of the Gulf. There may have been from six to fourteen present. He did not know all of them. Those that he knew were producing oil and salt at Spindle Top. He thought Mr. Joe Myers was talking at that meeting about the possibility of getting (the salt water) to the Neches River; that the only matter discussed was the proposition of getting the water to Neches River. He stated that sometimes a couple of the oil producers would come together and discuss the salt water disposition with the inspector; that the only co-operation between the producers was to get the water into the reservoir; that if they saw a reservoir breaking it was to their interest to take care of the water. They co-operated as the injunction demanded them to do so. Witness states he had permission from the Gulf Company to store salt water in their reservoir in 1924 and 1925. They did not charge anything. He did not ever attempt to turn any water out of it; that because of his interest he would get on his horse and ride around the reservoir sometimes. He was looking to the Gulf Company to control the salt water after it got in their tank as it was on their premises. He did not let any salt water get away except what would eat through the pipes, which was very little. He states on cross-examination he did not mean to say that all of the operators on the hill got together and built the line of ditches and run their water into the Gulf Company's tank. It was only those to whom the Gulf Company had given permission. * * *

"Each one of these operators out there, outside of the little fellows that had permission to put their salt water in the reservoir of the Gulf and Unity, each maintained their own salt water system so far as I know. That is a fact as I understand it. There was no co-operation between those people unless a jam came—when we could not turn it loose at the end of the six months period, we began to sit up and take notice. There was a meeting called, I believe, in 1925 as to what we should do. That was as to what we were to do afterwards. We had been operating distinctly and separately. In that meeting we discussed future plans. * * *

"On re-direct examination the witness said: "'I understood the Sun Company and the Unity Oil Company worked together some and I had permission to go through the Sun Company's line but that was not in 1925. That was the previous year. In 1924 and 1925 the Sun Company had a line to the Unity Oil pit for disposal of their salt water.' * * *

"Witness stated that the condition on which they got their salt water into the Gulf Company's tank was that they should get their oil; that the idea of connecting with Gulf Company's reservoir was to keep their salt water out of Hillebrandt Bayou and all the men knew that the waters from Spindle Top drained into Hillebrandt Bayou. He states: 'It was the general

understanding among the producers of Spindle Top that we would try to prevent the water going into Hillebrandt Bayou to the injury of the rice crops.' There were several independent reservoirs, those of the Unity Oil Company, Gulf Company and Wilson-Broach; that there was never any salt water association at Spindle Top."

Mr. Joe Myers testified:

"Witness states he never discussed salt water with any of the other producers, its production or release, except in an informal way."

After the water of the bayou had been polluted, there was evidence of co-operation among certain of the defendants to determine the extent of the pollution.

Some evidence was offered and some excluded as to a suit filed many years ago by appellant Broussard and others against certain of the defendants in this case to enjoin the operators of Spindle Top hill from releasing their drainage into Hillebrandt bayou. From the state of the record it is difficult to distinguish between the evidence offered and that excluded, but, as it was all admissible, we will make a statement to reflect the evidence that was offered to the court regarding that suit. In that suit plaintiffs prayed for a permanent injunction to restrain the operators from polluting the bayou, alleging practically the same grounds for relief urged in this case. The defendants, admitting that they were operators at Spindle Top, and were producing salt water, and that this water was draining into Hillebrandt bayou, answered further as follows:

"This defendant and others operating in the Spindle Top oil field, desiring to protect as far as practical, at a reasonable expense, the lands abutting Hillebrandt bayou, have hitherto made an effort at considerable and heavy expense, to conduct the salt water and other water liquid substances coming from their wells by a system of ditches—into large earthern tankage for storage during most, if not all, of the farming season, whence it might be ultimately emptied into the Neches river—but this effort on account of natural obstacles which defendants have as yet been unable to overcome, has been only measurably successful. These efforts are being now prosecuted in good faith and this defendant believes they will soon be successful."

The parties to that litigation settled the issues by agreeing that the district court should appoint an oil inspector to have charge of the production of salt water on Spindle Top, and to direct its control. All the operators were to be responsible to him, and, if they failed to control their salt water, he was to report to the court, and, as we understand the evidence offered, and that rejected, he was given certain summary powers against those who refused to control their salt water or to obey his directions as to its control. That suit was filed in 1909, and Spindle Top hill was operated for oil under that order continuously from that date until the filing of this suit. In the later years the appointment of the inspector was done informally by verbal orders of the trial judge, but all the operators recognized his authority, and at least as between each operator independently and the inspector there was a certain degree of co-operation towards preventing the drainage from flowing into Hillebrandt bayou at a time that would injure the riparian owners. Each operator on the hill was supposed to, and, in fact, did, contribute in proportion to his production towards the expenses of the inspector, that is, towards paying his salary, etc. The Gulf Company was the treasurer of this fund, collecting from the different operators their respective proportions, and issuing to the inspector a monthly check for his salary. During the closed season no operator had the right to release the water from his tank without the permission of the inspector, but during the closed season, if the tanks became full, on certain conditions and at certain times, this water could be released, but, as said, only with permission of the inspector. The evidence raised the issue that certain of these operators released their water surreptitiously; the evidence raised the issue also that due care was not exercised by the operators in taking care of their salt water; and, as a result, the drainage of the bayou was polluted during the closed seasons.

Some of the operators in 1909 were not producing oil in 1924 and 1925, and some of the defendants here were not producers in 1909, and were not parties to that suit. But in their operations each operator recognized the jurisdiction of the inspector, whether he was a party to the old suit or not, and concerted and co-operated with him to some extent to protect the drainage. The following statement from counsel for appellees to the trial court, in answer to the efforts of appellants to get before the jury certain issues arising under the old suit of 1909, explains fully the relations of the present defendants to that suit. Appellants tried to show the quota of the inspector's salary paid by each defendant. This evidence was excluded, but is reflected by the bills of exception. Answering appellants' tender of this testimony, Judge Kayser, for appellees, said:

"Your Honor, we want to call attention to this fact again; that specific provision is made in the order for the assessing of that very item as costs against those operators out there, and we object to any further inquiry as to any letters with reference thereto, because it has no bearing on any issue in this case, trying to establish a joint liability for turning that water loose."

Again, in objecting to the tender of evidence by appellants as to the amount of salary of Mr. Turner, one of the inspectors, while Mr. Turner was a witness in behalf of appellants, Judge Kayser said:

"This evidence is sought for the purpose, evidently, of establishing the allegation of joint acts of negligence. The district court of Jefferson County, as far back as 1910 has taken jurisdiction of the control and disposition of salt water from Spindle Top Hill. From time to time that jurisdiction has been exercised. It is expressly retained in the order; the jurisdiction of the subject matter is expressly retained in the order. Under the terms of the order, this gentleman's predecessor—Mr. Garner—was the first inspector appointed under that order. Then Mr. Horton, or I don't recall, but successively down to Mr. Turner, and from him to the present. In the order appointing Mr. Turner, or Mr. Turner's successor—we haven't been able to find the former order, appointing Mr. Turner, but we have the order here appointing Mr. Turner's successor, in which—

"Mr. Howth: That was subsequent to 1925—no, it was the latter part of 1925.

"Mr. Kayser: In which it is recited that Mr. Turner's resignation is accepted and Mr. Pietzch is appointed as his successor, with the same duties and powers and under the same regulations as his predecessor, Mr. Turner, and he shall receive the sum of $100.00 per month, as paid heretofore to his predecessor. Now, Your Honor, there couldn't be any other purpose than to distort our actions under the solemn judgment of the court, to establish that we did under compulsion—here is an officer of the court, whose salary is provided shall be paid, and we are sought to be penalized for doing what the court told us to do, and they seek now, because of that order, and our act, and establish, or seek to establish the fact of joint wrong, or joint actions in whatever wrongs they complain about in the petition. Now, that was involuntary. That's not under our control. We couldn't help it. It was under the solemn order of the court. And we make this claim, Your Honor, that whatever we did under that order is not evidence of any acts of negligence on our part, separately or jointly, and that the payment of that salary was a matter that we had nothing to do with, but was absolutely under the control of the court. If the court has any doubt, I want the court to read the order."

Again, in objecting to appellant's manner of proving the appointment of Mr. Turner, who was acting as inspector, Judge Kayser said:

"Your Honor, that is an attempt to attack the action of the court collaterally in this matter."

Again, in objecting to Mr. Turner testifying as to who paid his salary, Judge Kayser objected on the following grounds:

"Wait a minute. Now, we object to that; if it is offered at all by the plaintiff it can only be offered on the theory of evidence of joint actions, and that is the gravamen of our objection, and that is the reason he wants to get it in; we urge our same objection."

And again Judge Kayser said:

"Your Honor, that looks to me like it is seeking to make a collateral attack on a solemn order of this court, and I can't see how that could avail anything here; there is no question about his actions as inspector; he has already stated he was appointed by the court; this was an equity proceeding and the court had jurisdiction over it."

### Opinion.

Appellees advance the following four propositions as the substantive law of this case, in all of which we concur:

(1) One who contributes to the pollution of a stream is not answerable for the entire damage caused another, where separate and independent acts of others contribute to the pollution thereof, etc., but only for his own contribution to the injury.

(2) That it is a misjoinder of causes of action to seek recovery against several defendants for separate and independent acts.

(3) That, in order to render each and all of the defendants liable when jointly sued, the proof must show joint participation in the wrongful act or acts which caused the injury.

Independent acts, contributing to the pollution of a stream, are not such concurring acts of negligence as to render individuals jointly liable for the whole injury.

These propositions have full support, as we understand them, in the holding of the Galveston Court of. Civil Appeals in Sun Co. v. Wyatt, 48 Tex. Civ. App. 349, 107 S. W. 934. In Bunker Hill, etc., v. Polak (C. C. A.) 7 F. (2d) 583, the court said:

"It may be conceded that by the weight of authority it is settled that, where several persons act separately and independently and not in concert, there is no joint liability for their separate torts in cases of nuisance or the pollution of streams. Miller v. Highland Ditch Co., 87 Cal. 430, 25 P. 550, 22 Am. St. Rep. 254; Farley v. Crystal Coal Co., 85 W. Va. 595, 102 S. E. 265, and note, 9 A. L. R. 933; Livesay v. Denver First Nat. Bank, 36 Colo. 526, 86 P. 102, 6 L. R. A. (N. S.) 598, 118 Am. St. Rep. 120."

On this law appellees ask us to affirm the judgment of the trial court on their construction of the evidence that appellants failed to show concert or joint participation on the part of the defendants in the pollution of Hillebrandt bayou. We believe appellees are in error in their construction of the evidence. From the earliest days of its history the production of salt water by the oil wells on Spindle Top hill has been a menace to Hillebrandt bayou, rendering its waters unfit for irrigation, and doing great damage to the farmers who are compelled to rely upon its waters for irrigation purposes. The 1909 suit was filed by the farmers against the operators on Spindle Top for relief against that recurring and imminent danger. Beyond question, the plaintiffs in that suit were entitled to injunctive relief restraining the operators on the hill from releasing their salt water into the common drainage, to their great damage. Recognizing their obligation to the plaintiffs, defendants in that suit came

in by pleas admitting the production of salt water, and, in attempting to justify their actions, pleaded a concert among them to lessen and avoid the injury complained of, but confessing that their efforts had not been entirely successful.

By agreement of the parties to that suit, for on no other ground did the district court have jurisdiction to appoint an "oil inspector" to have general supervision of production of salt water on Spindle Top hill, the operators agreed to a concert of action and to the appointment of an inspector to direct and control the storage and discharge of salt water. This agreed judgment was in the nature of a contract, to which the court was a party, whereby the oil operators, by a concert of action, through the oil inspector, agreed to keep the salt water out of Hillebrandt bayou during the farming seasons, and a further agreement from the plaintiffs that it could be released into the bayou during the seasons when the pollution did not interfere with their irrigation. The oil inspector was, in a sense, the agent of all the operators to see that each performed his part of the obligation of keeping the salt water out of the drainage, and, recognizing their common duty to him, the operators obligated themselves to pay his salary, which they did faithfully from the entry of that order in 1909 until after the filing of this suit. This agreement on the part of the operators was their concession to the plaintiffs for the privilege of operating their wells. No court could compel them to operate their wells, but could restrain them from doing so when their operation was resulting in damage to other parties. But, that they might continue their operations free from restraint of the trial court, they agreed with the court and the plaintiffs to concert among themselves, through their oil inspector. The operators on the hill at that time, who were not parties to that litigation, made themselves parties to the agreement for controlling the water by contributing to the expenses of the oil inspector and by submitting themselves to his jurisdiction. The operators who have entered the field since 1909 also made themselves parties to that agreement in like manner. This was recognized by counsel for appellees in the statements we have quoted from the argument of Judge Kayser to the trial court.

As we understand the ruling of the court, the evidence as to this old lawsuit was excluded on the ground that the action of the defendants under that agreement was compulsory. There was nothing compulsory about it. The operators could have avoided its effect by closing down their wells, or by showing the court that they were not contributing to the pollution. The trial court had authority to make them do that, unless they took care of their salt water. In order to take care of their salt water, they voluntarily agreed to a concert of action by assuming the obligations of the agreement of 1909. Also it appears that the trial court considered the introduction of this evidence as constituting a collateral attack on that order. In no sense were appellants seeking to attack the order of 1909, but were directly invoking it as a basis of their cause of action to show a concert of action by the defendants under its provisions. The recognition by the operators on Spindle Top hill during 1924 and 1925 of the jurisdiction of the oil inspector, which was a continuance of the concert of action originating in the judgment of 1909, and which had never been modified, and their cooperation, through him, to prevent the pollution of Hillebrandt bayou by their separate productions of salt water, and their joint contribution towards the payment of his salary, as a matter of law, constituted concert of action among the defendants, making them jointly and severally liable for the injuries to plaintiffs' crops. This concert of action was a great benefit to appellees, giving them the privilege of operating their oil wells, and without which they could not have so operated. Having enjoyed its benefits, they cannot escape its consequences. This concert made them joint tort-feasors in the pollution of the bayou, liable as such as a matter of law to all persons injured by the wrongful release of salt water into the drainage into Hillebrandt bayou.

We think the authorities fully sustain this construction of the evidence and our conclusions of law thereon. To establish concert of action in a civil action the proof does not have to be as strong as required to establish a criminal conspiracy. Moses v. Morganton, 192 N. C. 102, 133 S. E. 421. But slight evidence of co-operation is sufficient to raise the issue. It is not necessary to show a common intent to commit the injury, but only that the defendants acted together in a common purpose, which resulted in the wrong. On this proposition it was said in Adler v. Pruitt, 169 Ala. 221, 53 So. 318, 32 L. R. A. (N. S.) 900:

"Those are joint tort feasors who contribute to the tort with common intent—in this case, not, of course, the intent to work injury to the plaintiffs, but the intent to maintain the purification plant which did result in injury."

So in this case it was not necessary for appellants to show the intent to work injury to plaintiffs, but only the intent to maintain the salt water on Spindle Top by obeying the orders of the 1909 judgment. In Bunker Hill, etc., v. Polak (C. C. A.) 7 F.(2d) 583, the court, though recognizing the general rule contended for by appellees by the following proposition:

"It may be conceded that by the weight of authority it is settled that, where several persons act separately and independently and not in con-

cert, there is no joint liability for their separate torts in cases of nuisance or the pollution of streams,"

—held the defendants jointly liable on the following summary of the evidence, which is strikingly in point on the facts of the case before us:

"The complaint in the present case distinctly alleges that the acts done by the defendants in dumping their mining, débris and other débris from their mining camps into the waters and tributaries of the river were done in pursuance of a common design and by a united and mutual concert of action, and that for many years they co-operated and worked together in the prosecution of such common purpose with complete accord and concert of action, and the complaint set forth the facts to show such concert of action, such as their construction of dams to impound the débris and their joint acquisition of written agreements from property owners for release of claims for damages to lands subject to overflow. It follows that the defendants were properly joined as tort-feasors."

■■ Appellees' sixth counter proposition, relied upon by them to sustain the trial court's judgment, is as follows:

"The plaintiff Robicheaux, pleading and proving a contract with the plaintiff Broussard, to furnish the water, land and seed for the rice crops of 1924–1925, had no right of action against the defendants for polluting Hillebrandt Bayou; his cause of action, if any he had, being upon his contract with Broussard to furnish the water."

Under this proposition, the facts are as follows:

The land belonged to Broussard. He rented the land to Robicheaux, contracting to furnish the water for irrigation purposes, and it was within the contemplation of Broussard and Robicheaux that this water should be taken from Hillebrandt bayou. Each was to have a half interest in the matured crop. The record does not show knowledge, in fact, by the defendants of the details of the contract between Broussard and Robicheaux, but does show that Robicheaux was in possession of the land, thereby visiting appellees with notice of his rights.

On this statement of the facts, appellants were tenants in common in the crops raised by Robicheaux, and had a joint cause of action for the damages suffered by them by reason of the pollution of the stream. Gulf, C. & S. F. R. Co. v. Foster (Tex. Civ. App.) 44 S. W. 200.

■ It follows that the trial court erred in sustaining appellees' plea of misjoinder of parties and causes of action. On another trial appellants should be permitted to inquire fully into all details relating to the 1909 suit, all agreements made under that suit, and all efforts made by the operators on Spindle Top hill to obey its provisions, and all benefits derived by the operators from this order, and also such modifications as have been made in the original decree since 1909, the appointment of the inspector under the decree, the manner of the payment of his salary, and the contributors to the salary.

For the reasons above discussed, the judgment of the trial court is reversed, and this cause remanded for a new trial.